2020 IL App (1st) 182499-U

No. 1-18-2499

Order filed March 5, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| MMM ELECTRIC INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 L 3938 |
| | ) | |
| EMF ELECTRIC COMPANY, | ) | Honorable |
| | ) | Daniel J. Kubasiak, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's determination that the defendant contractor received and unjustly retained a $37,000 benefit from the work provided by the plaintiff electrical subcontractor was not against the manifest weight of the evidence.

¶ 2    After a bench trial, the trial court awarded a judgment of $37,000 in favor of plaintiff, MMM Electric Inc., on its unjust enrichment claim against defendant, EMF Electric Company.

¶ 3    On appeal, defendant argues the judgment must be reversed because the trial court erred as a matter of law by using an incorrect measure of damages to award plaintiff $37,000 on its unjust

enrichment claim. In the alternative, defendant argues that the $37,000 judgment should be reversed because the record is devoid of any evidence of the actual unpaid hours of labor plaintiff and its laborers provided to defendant.

¶ 4     For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 5                                    I. BACKGROUND

¶ 6     This dispute arose from an alleged agreement between defendant, an electrical subcontractor, and plaintiff, the sub-subcontractor, concerning electrical work plaintiff performed at a five-building residential project in Aurora, Illinois.

¶ 7     Plaintiff sued defendant for breach of contract and unjust enrichment. According to plaintiff's 2018 third-amended complaint, it had a history of working with defendant since 2009. In February 2015, they entered into an oral contract for plaintiff to perform electrical work for the common areas and 417 units of the five buildings. Plaintiff alleged they agreed to an "equivalent hours" payment arrangement, whereby the completion of each unit would require an equivalent of 82 hours of work at the rate of $22 per equivalent hour, for a total of $752,268 based on 34,194 total equivalent hours. Regarding the common areas of the five buildings, the parties agreed to a sum of $528,000 based on 24,000 total equivalent hours of work at the rate of $22 per equivalent hour. Plaintiff also alleged the parties agreed to the same payment practice they had used on prior projects, whereby defendant would make monthly payments to plaintiff based upon the percentage of the project that plaintiff completed. Specifically, plaintiff would inform defendant of the

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

percentage of the work plaintiff had completed, and then defendant would bill the general contractor and, upon receiving payment, pay plaintiff for the services provided.

¶ 8     Plaintiff alleged that it provided services on this project from February 5 to April 23, 2015, equivalent to 6,140 hours of work, totaling $135,080, and requested payment from defendant. However, defendant paid plaintiff a total of only $31,675 and retained the balance of the money defendant received from the general contractor. Despite plaintiff's repeated demands, defendant refused, without any good faith basis, to pay the $103,405 balance due.

¶ 9     Plaintiff alleged that defendant (count I) breached its agreement by failing to pay the $103,405 balance due, (count II) breached its agreement by failing to pay plaintiff on a monthly basis so it could retain its workers and by refusing to allow plaintiff access to the worksite, which resulted in $364,783 in lost profits damages to plaintiff, and (count III) unjustly retained the $103,405 it had billed and received from the general contractor based on the work plaintiff had performed.

¶ 10     Plaintiff attached as an exhibit to its complaint the contract between defendant and the general contractor. According to this contract, defendant would be paid $3,750,000 in progress payments, whereby defendant would submit to the general contractor an application for payment for the value of the work completed and the percentage of completion of each portion of defendant's work as of the end of the period covered by the application. The general contractor had the right to inspect the work. If defendant submitted the application by the 15th of the month, then the general contractor would include the work covered by that application in the next application for payment the general contractor was entitled to submit to the architect. If the architect issued a certificate for payment for work properly performed, then the general contractor

would pay defendant each progress payment no later than 10 working days after the general contractor received the payment from the owner.

¶ 11    Defendant denied any liability to plaintiff and filed a counterclaim that alleged (count I) plaintiff breached its agreement by failing to pay its subcontractor electricians, which resulted in defendant having to pay the electricians an additional $21,549; (count II) plaintiff was unjustly enriched by defendant's $19,000 advance payments for labor, which plaintiff failed to use to pay its subcontractor electricians; (count III) plaintiff was liable for conversion because it failed to use the $19,000 advance payments for work at the Aurora project and instead used the money for its own purposes; and (count IV) plaintiff never intended to pay its electricians the $19,000 advance it fraudulently induced defendant to pay, and then defendant, under duress to ensure the timely completion of the electrical work on the project, had to directly pay the electricians $21,549.

¶ 12    Defendant moved the court for summary judgment, arguing that plaintiff had no evidence to support the value of its work or the percentage of the work it completed and could not pursue a claim for *quantum meruit* based on speculative evidence. Defendant contended that it was entitled to summary judgment because plaintiff could not prove the elements of its unjust enrichment claim.

¶ 13    Plaintiff responded that summary judgment was precluded by genuine issues of material fact regarding the existence of a contract between the parties and their agreement concerning advance payments.

¶ 14    The trial court denied defendant's motion for summary judgment, finding that questions of fact existed regarding whether a handwritten memorandum constituted a written agreement that

preempted plaintiff's unjust enrichment claim and whether plaintiff presented a reasonable basis for computing damages.

¶ 15    At the bench trial in October 2018, Denys Vyday, the president of plaintiff, testified that defendant and its president, Alek Britva, owed him between $18,000 and $19,000 for a project in Oswego, Illinois, which was finished in May 2014, and promised to pay Vyday this debt while he worked on the Aurora project at issue here. Vyday and some of his electrician subcontractors started work on the Aurora project in the summer of 2014 to install temporary power in a building's garage and install electrical boxes so that the other contractors could start their work. This portion of the work was paid on an hourly basis. Near the end of 2014, Vyday and Britva met to discuss plaintiff's work on the residential units and common areas of the Aurora project, which is at issue in this appeal. Vyday informed Britva that plaintiff needed to be paid at least $40,000 per month to cover the payroll for Vyday and his team of eight electricians, and Britva agreed to make these payments. Vyday and about four electricians began working in the units and common areas of buildings C and D in February 2015. All eight electricians began working with Vyday in the two buildings in the beginning of March 2015. They usually worked 10 hours a day and six days a week, weather permitting. The electricians submitted their hours to Vyday by text messaging, and Vyday did not keep any records or the text messages after he paid them. Vyday paid his electricians once every two weeks.

¶ 16    Vyday testified that defendant failed to pay him the agreed-upon $40,000 per month. Consequently, Vyday paid his electricians from his own pocket. Vyday repeatedly asked Britva to pay him so he could pay his electricians their wages. In April 2015, only three electricians were working at the Aurora project. Vyday had paid his electricians up to April 24, 2015, when Britva

telephoned him and fired him for no reason. Afterwards, an electrician informed Vyday that Britva had approached three electricians and offered them jobs. Vyday allowed his electricians to work for defendant so they could at least continue getting paid.

¶ 17    Vyday asserted that Britva never fully paid him the $15,000 balance he still owed Vyday for the prior Oswego project. Vyday also asserted that, after giving defendant credit for the $18,230 it sent Vyday during the 11-week work period on the Aurora project from February 5 to April 23, 2015, defendant still owed him $103,000 based on his completion at the time of his termination of 50% of the work of the entire project. Vyday also asserted that defendant owed him about $360,000 in lost profits, which would have been his net profit after he paid his electricians upon the completion of all their work in the five buildings.

¶ 18    The testimony of three of plaintiff's electricians indicated that, regarding plaintiff's and defendant's agreed payment rate of $22 per hour, Vyday paid his electricians $17 per hour and kept the $5 balance as his profit. Vyday, however, stopped paying them sometime in April 2015. Thereafter, two of those three witnesses were paid their owed wages by defendant. One of the three witnesses continued working on the Aurora project for defendant until it was finished a couple of years later. The witnesses were not certain when they started working on defendant's Aurora project and generally did not testify consistently with their affidavits regarding when they began working at the Aurora project. They did not testify regarding the actual number of hours they worked at the Aurora project or the amount of money plaintiff had paid them for the work they had provided. However, they testified consistently with Vyday that they generally worked on the Aurora project 10 hours a day and six days a week, weather permitting.

¶ 19    Plaintiff did not submit any documents into evidence. Moreover, plaintiff did not introduce any testimony showing the actual amount of time its electricians spent working on the Aurora project for plaintiff.

¶ 20    Defendant submitted into evidence, *inter alia*, its application to the general contractor for payment of $103,789.67 for several items of work done by various subcontractors through April 22, 2015. Regarding the electrical work of plaintiff and its electricians, defendant applied for a $27,000 payout, which consisted of three items: $20,000 billed for the work done on the units of building C, $3500 billed for the common area work of building C, and $3500 billed for the common area work of building D. According to the application, these three items represented the completion of 10%, 3% and 5%, respectively, of the overall work for each of those items.

¶ 21    Britva testified that defendant paid plaintiff for the temporary work it performed on the Aurora project in December 2014 on an hourly basis. However, beginning in February 2015, defendant paid plaintiff for its work on the Aurora project residential units and common areas on a fixed price basis. This process required defendant to submit a certified application for payment to the general contractor, which would have to approve the application before sending it to the bank. Then the bank would send a representative to the work site to assess how much work was completed. If the application was approved, then the title company would release the funds, defendant would sign a waiver to get its draw, and defendant would pay plaintiff based on the percentage of work plaintiff's electricians had completed. Defendant received its first draw on the Aurora project in April 2015 for $103,789, and $27,000 of that draw was designated as based on plaintiff's work.

¶ 22    Britva testified that defendant sometimes paid plaintiff an advance on larger projects to enable plaintiff to begin the work. However, Britva never discussed paying plaintiff a guaranteed minimum monthly amount of $40,000 or any other amount. Britva would never have agreed to such an arrangement, which had no relation to the actual amount of work plaintiff could have done each month. Defendant had never paid large guaranteed monthly amounts to plaintiff on any of the other large projects they had worked on together, and plaintiff had always been able to meet its payroll obligations. Moreover, defendant did not have the ability to pay a subcontractor $40,000 in February, March and April before defendant received its first draw from the general contractor.

¶ 23    Britva testified that on February 25, 2015, defendant sent plaintiff a $7230 check, of which $3230 was plaintiff's final payment for the Oswego project and $4000 was an advance so plaintiff could start work on the Aurora project. In April 2015, Vyday told Britva that he needed more money to pay his electricians to keep working, so on April 7, 2015, defendant sent plaintiff a $15,000 check while they waited for their first draw from the general contractor at the end of the month. A couple of weeks later, however, some electricians informed Britva that they still had not been paid. When Britva spoke with Vyday on April 24, 2015, Britva was dumbfounded to learn that Vyday had used the $15,000 to pay his taxes instead of his electricians. Britva told Vyday that he must pay his electricians because they were threatening to leave the job and file liens against the project. Vyday responded that he had no more money and Britva needed to send more money or else Vyday was leaving the project. Britva told Vyday that he was terminated for breach of contract and went to the job site and spoke to the electricians. The electricians submitted their work hours and unpaid wage amounts to Britva, who paid them through the end of April 2015. Only three of plaintiff's electricians remained on the job to work for defendant. This severe shortage of

manpower adversely affected defendant, which had to scramble to find another supervisor. The final building of the Aurora project was completed in June 2018. Plaintiff never issued a bill to defendant for any alleged money owed and had no documentation to show what it had allegedly paid its electricians.

¶ 24 Defendant submitted into evidence, *inter alia*, copies of the following posted checks: (1) a check dated February 25, 2015, for $7,350 payable to plaintiff, (2) a check dated April 7, 2015, for $15,000 payable to plaintiff, and (3) four checks, dated from April 24 to May 29, 2015, for a total of $12,672 payable to four electricians.

¶ 25 The trial court ruled that the parties never had an enforceable contract because they never reached an agreement on the essential elements of a contract. The court ruled in favor of plaintiff on its unjust enrichment claim and awarded plaintiff $37,000 in damages, finding that plaintiff's witnesses testified credibly regarding the work they performed and the payments they had received. The court determined that the evidence and witness testimony established that plaintiff "in fact provided some level of work" for defendant at the rate of $22 an hour and defendant never compensated plaintiff for this work. The trial court also ruled in favor of plaintiff on defendant's counterclaim, finding that defendant failed to satisfy its burden to prove its claims of unjust enrichment, conversion and fraud.

¶ 26 Defendant timely appealed. Plaintiff has not filed a brief on appeal, so this matter is taken for consideration on the record and defendant's brief only.

¶ 27                                        II. ANALYSIS

¶ 28 Defendant argues that the trial court erroneously applied the measure of damages used in a *quantum meruit* claim to plaintiff's unjust enrichment claim. Defendant believes that the trial

court used a *quantum meruit* measure of damages because the $37,000 award "appears to be based on the actual [number of uncompensated] hours of electrical labor" that plaintiff provided to defendant. Defendant also argues that the trial court's $37,000 award was against the manifest weight of the evidence because plaintiff failed to meet its burden to prove a case for damages based upon the hours of uncompensated work it performed for defendant. Defendant asserts that plaintiff "simply failed to provide any evidence whatsoever from which a [trier] of fact could make a reasoned determination of what, if anything, [plaintiff] was owed for the electrical labor provided to [defendant] by [plaintiff].

¶ 29     Defendant's arguments lack merit. Unjust enrichment and *quantum meruit* claims are similar quasi-contract claims, "in that the plaintiff must show that valuable services or materials were furnished by the plaintiff, received by the defendant, under circumstances which would make it unjust for the defendant to retain the benefit without paying." *Hayes Mechanical, Inc. v. First Industrial, L.P.*, 351 Ill. App. 3d 1, 9 (2004). "In a *quantum meruit* action, the measure of recovery is the reasonable value of work and material provided, whereas in an unjust enrichment action, the inquiry focuses on the benefit received and retained as a result of the improvement provided by the contractor." *Id*. (citing 66 Am. Jur. 2d *Restitution and Implied Contracts* § 9 (2001)).

¶ 30     "Notably, even when a person has received a benefit from another, he is liable for payment ' "only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it. The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor." ' " *Hayes Mechanical, Inc.*, 351

Ill. App. 3d at 9 (quoting *Rutledge v. Housing Authority of City of East St. Louis*, 88 Ill. App. 3d 1064, 1069 (1980) (quoting Restatement of Restitution § 1, Comment *c* (1937))).

¶ 31 Unjust enrichment is not an independent cause of action. *Martis v. Grinnell Mutual Reinsurance Co.*, 388 Ill. App. 3d 1017, 1024 (2009). Rather, it is a remedy for "unlawful or improper conduct as defined by law, such as fraud, duress or undue influence" (internal quotation marks omitted) (*Alliance Acceptance Co. v. Yale Insurance Agency, Inc.*, 271 Ill. App. 3d 483, 492 (1995)), or, alternatively, it may be based on contracts which are implied in law (*Perez v. Citicorp Mortgage, Inc.*, 301 Ill. App. 3d 413, 425 (1998)). Damages in an unjust enrichment claim are restitution measured by the defendant's gain, not the plaintiff's loss. *Raintree Homes, Inc. v. Village of Long Grove,* 209 Ill. 2d 248, 257-58 (2004).

¶ 32 Relevant to the instant appeal, the Restatement (Third) of Restitution and Unjust Enrichment § 49 (2011) articulates the standard remedy of restitution in money and identifies the usual ways that unjust enrichment is measured for this purpose:

> "(1) A claimant entitled to restitution may obtain a judgment for money in the amount of the defendant's unjust enrichment.
>
> ***
>
> (3) Enrichment from the receipt of nonreturnable benefits may be measured by
>
>> (a) the value of the benefit in advancing the purposes of the defendant,
>>
>> (b) the cost to the claimant of conferring the benefit,
>>
>> (c) the market value of the benefit, or

(d) a price the defendant has expressed a willingness to pay, if the

defendant's assent may be treated as valid on the question of price."

¶ 33     A trial court's findings of fact will not be disturbed on appeal unless those findings are against the manifest weight of the evidence. *Gass v. Anna Hospital Corp.,* 392 Ill. App. 3d 179, 183 (2009). "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002).

¶ 34     Our review of the record establishes that the evidence supports the trial court's finding that defendant received and retained a $37,000 benefit as a result of the improvement provided by plaintiff. The trial court found the testimony of Vyday and the three electricians credible regarding the work they performed and the payments they had received. Vyday testified that defendant owed him about $19,000 from the prior Oswego project and promised to pay that debt while plaintiff worked on the Aurora project. This evidence supports a finding that defendant was not entitled to credit for any money it claimed it had advanced to plaintiff for the Aurora project.

¶ 35     Furthermore, the parties' testimony established that defendant had expressed a willingness to pay the rate of $22 an hour for plaintiff's electrical services. According to the evidence, Vyday and his electricians worked 11 weeks—February 5 to April 23, 2015. They usually worked 60 hours a week, weather permitting. According to Vyday's testimony, he worked on the Aurora project in February 2015 with a crew of four electricians, in March 2015 with a crew of eight electricians, and then in April 2015 with a crew of three electricians. Vyday testified that he had paid his electricians once every two weeks from his own pocket up to April 24, 2015, when defendant fired him for no reason.

¶ 36    Defendant asserted that he only received $27,000 from the general contractor for the value of plaintiff's work by the end of April 2015, which defendant claimed represented less than 20% of the total work plaintiff had agreed to perform. However, Vyday asserted that he and his electricians had completed about 50% of the total work when defendant fired him at the end of April 2015 for no reason. Vyday's electricians supported his testimony that they had worked at a rapid pace on the Aurora project and often had to wait for other subcontractors to complete their portion of the construction work before plaintiff's electricians could commence their work in the newly constructed units. Accordingly, the record contains evidence that defendant retained a benefit in excess of the $27,000 draw defendant received based on the amount of completed work defendant attributed to plaintiff in defendant's April 2015 application to the general contractor for payment.

¶ 37    The $37,000 award divided by 11 weeks (*i.e.*, the duration of plaintiff's work for defendant on the Aurora project) would represent a weekly payment to plaintiff of $3,363.64 to cover plaintiff's payroll. The $3,363.64 weekly payment divided by $22 per hour (the price defendant had expressed a willingness to pay) would represent 152.89 hours of work per week. If Vyday or one of his electricians worked only 40 hours a week, that weekly wage would cover the pay for a crew of less than four electricians. We cannot find that the trial court's determination—that defendant received and unjustly retained a $37,000 benefit from the work provided by plaintiff—was against the manifest weight of the evidence.

¶ 38                                III. CONCLUSION

¶ 39    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 40    Affirmed.